IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

ALFREDO VARGAS,

    Petitioner,                      No. CIV S-09-1697 GEB GGH P

    vs.

ANTHONY HEDGPETH,

    Respondent.                    FINDINGS & RECOMMENDATIONS

_____/

I. Introduction

        Petitioner is a state prisoner proceeding pro se with a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254. Petitioner challenges his 2007 conviction for rape, residential burglary, home invasion robbery, assault with a firearm and false imprisonment. Petitioner was sentenced to an indeterminate prison term of 25 years to life.[1] This action is proceeding on the original petition filed June 18, 2009, raising the following claims: 1) the police used unduly suggestive identification procedures which the trial court allowed into evidence; 2) the trial court erred by directing the jury to continue its deliberations and allowing the entry of

\\\\\

---

[1] Petitioner's original sentence of 25 years to life without parole was amended by the California Court of Appeal. People v. Vargas, 2008 WL 565679 at *10.

partial verdicts;[2] and 3) petitioner's sentence was improperly enhanced by juvenile adjudications. Petition at 10-24.

After carefully considering the record, the court recommends that the petition be denied.

## II. Anti-Terrorism and Effective Death Penalty Act (AEDPA)

The Anti-Terrorism and Effective Death Penalty Act (AEDPA) "worked substantial changes to the law of habeas corpus," establishing more deferential standards of review to be used by a federal habeas court in assessing a state court's adjudication of a criminal defendant's claims of constitutional error. Moore v. Calderon, 108 F.3d 261, 263 (9th Cir. 1997).

In Williams (Terry) v. Taylor, 529 U.S. 362, 120 S. Ct. 1495 (2000), the Supreme Court defined the operative review standard set forth in § 2254(d). Justice O'Connor's opinion for Section II of the opinion constitutes the majority opinion of the court. There is a dichotomy between "contrary to" clearly established law as enunciated by the Supreme Court, and an "unreasonable application of" that law. Id. at 1519. "Contrary to" clearly established law applies to two situations: (1) where the state court legal conclusion is opposite that of the Supreme Court on a point of law, or (2) if the state court case is materially indistinguishable from a Supreme Court case, i.e., on point factually, yet the legal result is opposite.

"Unreasonable application" of established law, on the other hand, applies to mixed questions of law and fact, that is, the application of law to fact where there are no factually on point Supreme Court cases which mandate the result for the precise factual scenario at issue. Williams (Terry), 529 U.S. at 407-08, 120 S. Ct. at 1520-1521 (2000). It is this prong of the AEDPA standard of review which directs deference to be paid to state court decisions. While the deference is not blindly automatic, "the most important point is that an *unreasonable* application

---

[2] While petitioner presents these as two separate claims the court will discuss them together.

of federal law is different from an incorrect application of law....[A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." Williams (Terry), 529 U.S. at 410-11, 120 S. Ct. at 1522 (emphasis in original). The habeas corpus petitioner bears the burden of demonstrating the objectively unreasonable nature of the state court decision in light of controlling Supreme Court authority. Woodford v. Viscotti, 537 U.S. 19, 123 S. Ct. 357 (2002).

"Clearly established" law is law that has been "squarely addressed" by the United States Supreme Court. Wright v. Van Patten, 552 U.S. 120, 125, 128 S.Ct. 743, 746 (2008). Thus, extrapolations of settled law to unique situations will not qualify as clearly established. See e.g., Carey v. Musladin, 549 U.S. 70, 76, 127 S.Ct. 649, 653-54 (2006) (established law not permitting state sponsored practices to inject bias into a criminal proceeding by compelling a defendant to wear prison clothing or by unnecessary showing of uniformed guards does not qualify as clearly established law when spectators' conduct is the alleged cause of bias injection).

The state courts need not have cited to federal authority, or even have indicated awareness of federal authority in arriving at their decision. Early v. Packer, 537 U.S. 3, 123 S. Ct. 362 (2002). Nevertheless, the state decision cannot be rejected unless the decision itself is contrary to, or an unreasonable application of, established Supreme Court authority. Id. An unreasonable error is one in excess of even a reviewing court's perception that "clear error" has occurred. Lockyer v. Andrade, 538 U.S. 63, 75-76, 123 S. Ct. 1166, 1175 (2003). Moreover, the established Supreme Court authority reviewed must be a pronouncement on constitutional principles, or other controlling federal law, as opposed to a pronouncement of statutes or rules binding only on federal courts. Early v. Packer, 537 U.S. at 9, 123 S. Ct. at 366.

However, where the state courts have not addressed the constitutional issue in dispute in any reasoned opinion, the federal court will independently review the record in adjudication of that issue. "Independent review of the record is not de novo review of the

constitutional issue, but rather, the only method by which we can determine whether a silent state court decision is objectively unreasonable." Himes v. Thompson, 336 F.3d 848, 853 (9th Cir. 2003).

III. Background

The opinion of the California Court of Appeal opinion contains a factual summary. After independently reviewing the record, the court finds this summary to be accurate and adopts it below.

> The three Spanish-speaking victims were in bed in their small one-bedroom apartment when petitioner broke in, assaulted them with a handgun, robbed them, and raped one of the victims after binding her husband and forcing him into the bathtub with his sister.
>
> Gabriel H., his wife, Marina, and his sister, Guillermina, went to bed between 9:00 and 9:30 p.m. on April 20, 2006. An intruder [later identified as petitioner] awakened them. Before Gabriel could call the police, [petitioner] was in the apartment and demanded money he claimed Gabriel owed him. Gabriel testified he had never seen [petitioner] before and did not owe him any money. [Petitioner] threatened Gabriel, and to demonstrate he "wasn't playing," he fired a shot into a pillow on a bed in the living room. When Marina came into the living room, [petitioner] pointed the gun at her and ordered her to approach him.
>
> Meanwhile, Guillermina called 911, but unable to communicate with the English-speaking operator, she hung up. [Petitioner] forced Gabriel and Marina back into the bedroom, and when the telephone rang, he answered it. In response to the 911 operator's inquiries, [petitioner] assured her everything was fine and some children had been playing with the phone. Guillermina, with a gun at her head, confirmed that everything was fine.
>
> [Petitioner] bound Gabriel and Guillermina with duct tape, forced them into the bathtub, and put towels over their heads. Back in the bedroom with Marina, he demanded money and swung his gun at her head. She ducked. When he could not find any money, he threw Marina to the floor and told her he was going to rape her. She pleaded with him not to rape her, telling him she was pregnant and it would hurt the baby. When Gabriel heard this, he escaped through a bathroom window. [Petitioner] removed Marina's clothes and raped her. Gabriel broke a plastic soap dish as he climbed out the window and thereby alerted defendant to his escape.
>
> Angry about the escape, [petitioner] pointed his gun at Marina and again demanded money. She gave him $40 to $50 from her purse and another $50 to $70 from Guillermina's purse. [Petitioner] also took Marina's cell phone, a watch, a DVD player, and a Diskman and, threatening to kill her, demanded that she put the items in a bag for him. She went to the kitchen for a bag and then escaped, eventually going to her brother-in-law's apartment in the same complex, where

> she discarded her panties because she was "disgusted."
>
> All three victims provided a description of their assailant and identified pictures of him. The details are provided in part I at pages 5-6, post. Suffice it to say, Marina did not initially tell the police she had been raped, but she told her husband later that evening. Gabriel urged her to tell the police about the rape, and she did. She went to the hospital within a few hours for a pelvic examination. Vaginal samples were taken. A DNA expert testified that the sperm cell portion from the vaginal sample had a DNA profile that matched [petitioner's].
>
> Police found [petitioner] hiding in a shed just before midnight on April 21, 2006. He had a mole on the left side of his face, next to his nose, and was wearing a black T-shirt, black baggy pants, and white tennis shoes, just as all three victims had described.
>
> [Petitioner] testified on his own behalf. He claimed he met Gabriel and Marina at a bar in December 2005. About two months later, Marina flirted with him and begged to have sex with him when they met again at a friend's house. A man of manners, he refused to have sex with her in someone else's house, but two weeks later he drove her to a cemetery in a borrowed car, where they had sexual intercourse. According to [petitioner], they continued their illicit affair for several months and had intercourse as recently as April 18, 2006, just two days before the charged offenses. There was evidence admitted that sperm may stay in the vagina for up to five days. [Petitioner] contended Marina framed him to cover up their illicit affair. She testified she had never seen him before the night she was raped.
>
> [Petitioner] offered an alibi defense. Although when arrested he told the police officers he had been at his mother's the entire night, his mother testified he left between 9:00 and 10:00 p.m. A long-time friend testified she and her son picked up [petitioner] at 9:30 p.m., and they all spent the night at a trailer on a farm. [Petitioner] and the friend gave vastly different descriptions of the farm and the kinds of animals that resided there. [Petitioner's] 16-year-old niece also testified she saw [petitioner] with a woman in an alley in March 2006 whom she later identified as a woman she saw at the courthouse.

People v. Vargas, 2008 WL 565679 at *1-2.

IV.  Argument & Analysis

  Claim 1 - Identification Procedures

  Petitioner alleges that the trial court erred in permitting the introduction of certain identification evidence when the procedures used by police tainted the identifications. Petition at 10.

  Legal Standard

  The Due Process Clause of the United States Constitution prohibits the use of

5

identification procedures which are "unnecessarily suggestive and conducive to irreparable mistaken identification." Stovall v. Denno, 388 U.S. 293, 302, 87 S.Ct. 1967 (1967), overruled on other grounds by Griffith v. Kentucky, 479 U.S. 314, 326, 107 S.Ct. 708 (1987) (discussing retroactivity of rules propounded by Supreme Court). A suggestive identification violates due process if it was unnecessary or "gratuitous" under the circumstances. Neil v. Biggers, 409 U.S. 188, 198, 93 S.Ct. 375 (1972). See also United States v. Love, 746 F.2d 477, 478 (9th Cir. 1984) (articulating a two-step process in determining the constitutionality of pretrial identification procedures: first, whether the procedures used were impermissibly suggestive and, if so, whether the identification was nonetheless reliable). Each case must be considered on its own facts and whether due process has been violated depends on "'the totality of the circumstances' surrounding the confrontation." Simmons v. United States, 390 U.S. 377, 383, 88 S.Ct. 967 (1968). See also Stovall, 388 U.S. at 302.

An identification procedure is suggestive where it "[i]n effect ... sa[ys] to the witness 'This is the man.'" Foster v. California, 394 U.S. 440, 443, 89 S.Ct. 1127 (1969). One-on-one identifications are suggestive. See Stovall, 388 U.S. at 302. However, "the admission of evidence of a showup without more does not violate due process." Biggers, 409 U.S. at 198. One-on-one identifications are sometimes necessary because of officers' and suspects' strong interest in the expeditious release of innocent persons and the reliability of identifications made soon after and near a crime. See, e.g., United States v. Kessler, 692 F.2d 584, 585 (9th Cir. 1982).

If the flaws in the pretrial identification procedures are not so suggestive as to violate due process, "the reliability of properly admitted eyewitness identification, like the credibility of the other parts of the prosecution's case is a matter for the jury." Foster v. California, 394 U.S. at 443, n. 2; see also Manson v. Brathwaite 432 U.S. 98, 116, 97 S.Ct. 2243 (1977) ("[j]uries are not so susceptible that they cannot measure intelligently the weight of identification testimony that has some questionable feature").

Discussion

The Court of Appeal discussed the pertinent background information of the identification:

> Gabriel was first interviewed by a Spanish-speaking police officer. At the time, he was standing about 20 to 30 feet from the other two victims. He described the assailant as an Hispanic male with a yellow or light-colored goatee and very short hair. Sergeant Steven Carillo overheard the description. Earlier that night, Carillo had been shown a "BOL" (be on the lookout) photograph he believed might be the assailant. After another officer retrieved the photograph from the police station, Carillo showed it to Gabriel and asked, "Is this or is this not the guy that we're talking about?" Gabriel, pointing to the photograph, stated, "Yes, yes, yes, that's him." Carillo testified the other victims would not have been able to hear Gabriel or see the photo he was shown.
>
> Gabriel told his wife and sister he had been shown a photograph of their assailant. Later, they were shown a six-photo lineup and told that the assailant might not be depicted in the lineup. Both women identified [petitioner]. The photo was different from the BOL photo that was shown to Gabriel. Gabriel was standing about 15 feet away when Marina and Guillermina were shown the six-photo lineup.

People v. Vargas, 2008 WL 565679 at *2-3.

The trial court denied petitioner's motion to suppress the identification evidence. Petitioner argues that both the one-photo and six-photo lineups were unduly suggestive and the trial court's ruling was in error. Petitioner's argument was considered and denied on direct appeal.

> The trial court ruled that neither the one-photo lineup shown to Gabriel nor the six-photo lineup shown to Marina and Guillermina was unduly suggestive. The court explained: "So here, I think, it's a classic example that they're looking for a suspect. A crime has just occurred-we don't know what the crime is-some sort of a crime has just occurred and I think it's reasonable to show a single photograph under these circumstances, and the witness, it looks like he gave a pretty definite ID as to that person.
>
> "So when this crime happened, I think we can infer that it's fairly recent because the officer was dispatched at 9:54 p.m.... [S]o this wasn't very long, and under the circumstances, I think it's appropriate for the officer to show a single photograph."
>
> There is nothing inherently unfair about a single-person photographic showup. (People v. Floyd (1970) 1 Cal.3d 694, 714 (Floyd).) "Showing the witnesses a single photo of the defendant is no more impermissibly suggestive than an in-court identification with the defendant personally sitting at the defense counsel table in the courtroom." (People v. Yonko (1987) 196 Cal.App.3d 1005,

7

1008-1009.) The use of a single-person or single-photo showup will be upheld when warranted by the circumstances. (Floyd, supra, 1 Cal.3d at p. 711.) Moreover, if we find the challenged procedure is not impermissibly suggestive, the due process claim fails. (Ochoa, supra, 19 Cal.4th at p. 412.)

Here, as the trial court explained at some length, the exigency of the circumstances certainly warranted the prompt single-photo showup. Gabriel had provided a description of the assailant, who remained at large. Based on this description, Carillo had reason to believe the suspect might be the same person he had seen in a police briefing less than two hours earlier. The photograph was quickly retrieved and shown to Gabriel. Carillo made no suggestive comments. Gabriel, who had ample opportunity to observe the intruder, unequivocally identified the person depicted as the assailant. With the assailant at large in the community, the crimes fresh, and without any misconduct by the police or impermissible suggestions, we agree with the trial court that the circumstances warranted the police officer's quick retrieval of the single photograph. Showing it to Gabriel was not so impermissibly suggestive as to give rise to a substantial likelihood of misidentification. (People v. Pervoe (1984) 161 Cal.App.3d 342, 359.)

[Petitioner] relies on two readily distinguishable federal cases to support his claim that showing Gabriel the BOL photo of defendant was so suggestive it was all but inevitable he would identify defendant as the intruder. In Foster v. California (1969) 394 U.S. 440 [22 L.Ed.2d 402], the witness expressed considerable uncertainty and failed to pick the defendant out of a lineup. (Id. at p. 441.) Only then did the police arrange a second lineup; the defendant was the only person who had also been in the first lineup. (Id. at pp. 441-442.) Similarly, in United States v. Watkins (5th Cir.1984) 741 F.2d 692, witnesses were unable to identify the defendant, who had been brought to the scene of the crime in a patrol car. (Id. at p. 694.) One witness gave an equivocal identification even though the robber had been wearing a stocking mask and the witness had been lying on the floor for all but a few seconds. (Id. at pp. 693-694.) In both cases, the identifications were not admissible because the circumstances suggested a substantial likelihood of misidentification.

Here, by contrast, [petitioner] had not worn a mask or camouflaged his appearance. Gabriel observed him for a considerable period of time in the living room, bedroom, and as defendant forced him into the bathtub. There was nothing equivocal about his immediate identification and nothing improper or suggestive about the police responding to the exigencies of their in-field investigation. [Petitioner's] federal cases do not assist him.

[Petitioner] further insists that the six-photo lineup shown to Marina and Guillermina was also constitutionally deficient. Again we disagree. [Petitioner] contends that the fact Gabriel told them he had identified a photograph of him tainted their own identifications. The record belies his contention. Neither woman ever saw the photograph Gabriel identified as the intruder, and in fact, a different photograph was included in their lineup. Both were admonished that the suspect might not be in the lineups they were shown. Gabriel was not present during their lineups. Thus, there are no facts to support [petitioner's] contention that Marina and Guillermina would have been more likely to choose his

8

> photograph.
>
> Actually, the males depicted in the photo lineup all appeared to be Hispanic males in their 20s or 30s with moustaches or goatees and closely cropped hair. All have closed mouths and serious expressions. Nevertheless, [petitioner] complains that the light blue background color of his photograph is different from the background colors of the others. But [petitioner's] picture does not stand out because the background colors of all the photographs vary from dark gray to brown to light gray to light green. There was nothing impermissibly suggestive about the six-photo lineup.

People v. Vargas, 2008 WL 565679 at *3-4.

Other than simply concluding the identification was improper, petitioner presents no arguments to demonstrate that the state court opinion was contrary to established Supreme Court authority. In fact, the procedures used by the police and the various court rulings comply with established federal authority. Looking at the 'totality of the circumstances' there is no evidence that any of the procedures, either the one-photo or six-photo lineup, were unduly suggestive. As the other courts repeatedly pointed out, the police arrived immediately after the incident while petitioner was armed and in the vicinity. Only after Gabriel gave a detailed description of petitioner, did the police show him the single photograph. This is the type of situation when a single photograph is necessary. Stovall v. Denno, 388 U.S. at 302.

Nor is there any indication that showing the other victims the six-photo lineup was improper. While the other victims were aware that Gabriel had a seen a photograph of petitioner, Gabriel was not with them when they viewed the six-photo lineup, and they immediately identified petitioner. Petitioner points to no evidence that police were unduly suggestive in preparing this line up. Petitioner's argument that the blue background in his picture was unduly suggestive was properly denied by the state courts and is meritless.

Moreover, petitioner's defense at trial was that he was having a romantic affair with the rape victim for several months and only days before they had sexual intercourse that explained the presence of his DNA. Petitioner argued that she framed him to cover up the affair and consensual sexual relations. While this is a technically valid argument, though the jury was

9

not convinced, petitioner essentially concedes that he knew the victim intimately, thus she could easily identify him which would preclude any police procedures from being unduly suggestive.[3]

For all these reasons this claim should be denied.

Claim 2 - Jury Deliberations

Petitioner argues that the trial court erred by directing the jury to continue deliberating and accepting partial verdicts. Petition at 16-22.

Legal Standards

"Coercive statements from the judge to the jury result in a denial of the defendant's right to a fair trial and an impartial jury." Packer v. Hill, 291 F.3d 569, 578 (9th Cir.), rev'd. on other grounds, 537 U.S. 3, 123 S.Ct. 362 (2002). However, upon learning that the jury is deadlocked, a judge may properly charge the jury to resume deliberations. See Allen v. United States, 164 U.S. 492, 501, 17 S.Ct. 154, 157 (1896) (approving a charge which encouraged the minority jurors to reexamine their views in light of the views expressed by the majority). The propriety of this supplemental "Allen charge" must be judged "in its context and under all the circumstances[.]" Jenkins v. United States, 380 U.S. 445, 446, 85 S.Ct. 1059, 1060 (1965) (per curiam); see Jiminez v. Myers, 40 F.3d 976, 980 (9th Cir. 1993, as amended Oct. 28, 1994) (per curiam) ("We consider whether the court's actions and statements were coercive in the totality of the circumstances."). In assessing the coerciveness of a supplemental instruction, a court must look to: "(1) the form of the instruction; (2) the period of deliberation following the Allen charge; (3) the total time of jury deliberations; and (4) the indicia of coerciveness or pressure upon the jury." United States v. Foster, 711 F.2d 871, 884 (9th Cir.1983, *as amended Dec. 13, 1983*) (*en banc*) (italics in original).

---

[3] Presumably had the trial court suppressed the identification evidence, petitioner may not have testified that the victim knew him. However, the undersigned must view all the evidence at trial and petitioner testified under oath that he was intimately acquainted with her. Petitioner views habeas corpus not as a search for the truth but as a sporting contest where he gets to have the legal equivalent of a mulligan, if his first "shot" went awry. Petitioner's arguments in this section were frivolous.

Discussion

The Court of Appeal set forth the relevant background regarding these claims.

> The jury began to deliberate following six days of testimony and argument. During the second full day of deliberations, the jury requested the court reporter to read back expert testimony, after which the foreperson informed the court the jury had reached verdicts as to some of the counts. At the end of the second full day of deliberations, the jury requested the definition of "firearm." The court provided the definition and then inquired whether the jurors had agreed to any verdicts. The foreperson reported that they had and had signed the appropriate verdict forms. The court asked the foreperson to date the verdict forms and to return them to the bailiff.
>
> After the clerk read the verdicts, the court polled the individual jurors to confirm. They found defendant guilty of six counts and all the attendant special allegations. The foreperson announced that the jury was still deliberating on the rape and assault with a firearm counts. The court declared a four-day recess, including a weekend and a legal holiday.
>
> After the recess, the jury continued its deliberations for about 45 minutes, when the court received a note from the foreperson stating the jury was unable to reach a verdict on one count. The foreperson inquired whether the verdict form should be left blank or signed not guilty. The court explained that a not guilty verdict would mean that all 12 jurors agreed defendant was not guilty, whereas if they could not reach a verdict it "means there's no verdict." After the foreperson assured the jurors' question had been answered, the court stated it would send the jury back for further deliberations.
>
> The foreperson responded, "Well, I think we're done deliberating." The court explained: "Re-read doesn't count as deliberations. I mean, you haven't been deliberating that long. I mean, as far as how many hours, I don't know, it's probably five or six hours. So I think there's still ample time for deliberation, so I want to send you back for further deliberations. It's still pretty early in deliberations, so we'll send you back for further deliberations."
>
> Five hours later, the jury returned guilty verdicts on the two remaining counts of rape and assault with a firearm, and found true all the related enhancements.

People v. Vargas, 2008 WL 565679 at *4-5.

Petitioner contends the trial court erred in directing the jurors to continue their deliberations after their foreperson announced they had reached an impasse. He also argues it was an error for the trial court to allow the jury to enter its verdicts as to some of the counts before the holiday weekend and the remaining counts after the weekend.

\\\\\

<u>Deliberations</u>

The Court of Appeal denied petitioner's claim that the trial court coerced the jury into reaching a guilty verdict.

> As recounted above, the court directed the jury to continue its deliberations when the foreperson reported an impasse following 45 minutes of renewed deliberations after the four-day recess. [Petitioner] sees the court's order as an abuse of discretion. We do not.
>
> If jurors have not reached a unanimous verdict, they cannot be discharged until "it satisfactorily appears that there is no reasonable probability that the jury can agree." (§ 1140.) The determination of whether there is a "reasonable probability" of an agreement rests within the "sound discretion" of the trial court. (<u>People v. Bell</u> (2007) 40 Cal.4th 582, 616.) "Although the court must take care to exercise its power without coercing the jury into abdicating its independent judgment in favor of considerations of compromise and expediency [citation], the court may direct further deliberations upon its reasonable conclusion that such direction would be perceived ' "as a means of enabling the jurors to enhance their understanding of the case rather than as mere pressure to reach a verdict on the basis of matters already discussed and considered." [Citation.]' [Citation.]" (<u>People v. Proctor</u> (1992) 4 Cal.4th 499, 539.)
>
> There is nothing in the record to suggest coercion or untoward pressure exerted by the court. Rather, the court pointed out that the jury had spent considerable time relistening to testimony. Moreover, they had only been deliberating the final two counts for 45 minutes after their four-day break. It was eminently reasonable, without conducting an inquiry of the jurors, for the court to conclude that additional deliberation might break the impasse.
>
> The court did not, as [petitioner] suggests, exhort the jury to reach a verdict. It did not encourage a particular result or express an opinion that a verdict should be reached. Unlike the cases cited by [petitioner], the court did not humiliate, threaten, or cajole the jurors to reach a verdict. (<u>People v. Carter</u> (1968) 68 Cal.2d 810, 819-820; <u>People v. Crossland</u> (1960) 182 Cal.App.2d 117, 118-119; <u>People v. Crowley</u> (1950) 101 Cal.App.2d 71, 74-75.) Quite simply, the court exercised its discretion in a very reasonable and straightforward manner, directing the jurors to continue their deliberations in an attempt to reach a unanimous verdict. We can find no abuse of the sound discretion invested in the trial court.

<u>People v. Vargas</u>, 2008 WL 565679 at *7.

Petitioner has failed to demonstrate that the trial court informing the jury to continue deliberating was a violation under established federal law. After a four day weekend, the jury deliberated for forty-five minutes, until 9:45 am, concerning the final two counts when the jury indicated they were done deliberating. RT at 584, Clerk's Transcript (CT) at 208. In

12

addition to only the forty-five minutes of deliberation that morning, the trial court noted that in total, the jury had only been deliberating for about five to six hours regarding the case as much time was also spent with testimony being read back. RT at 585. The trial court then stated: "So I think there's still ample time for deliberations, so I want to send you back for further deliberations. It's still pretty early in deliberations, so we'll send you back for further deliberations." Id. The jury reached a verdict on the final two count at 2:45 pm. CT at 209. With respect to the factors set forth in Foster, it is clear that the trial court properly instructed the jury to continue deliberating and the state court opinion was not contrary to federal authority. Petitioner has failed to show any violation of the Constitution or federal law and this claim should be denied.

Partial Verdicts

Petitioner also argues that the partial verdicts constituted reversible error. This claim was denied by the Court of Appeal on direct appeal.

> Both federal and state courts recognize that a trial court has the discretion to allow a jury to make a separate return of its verdict as to some counts, continue to deliberate the remaining counts, and then return its verdict as to the remaining counts. (United States v. Ross (9th Cir. 1980) 626 F.2d 77, 81 (Ross); People v. Rigney (1961) 55 Cal.2d 236, 246.) The seriatim entry of verdicts has come to be known as "partial verdicts," although at least one court has more accurately described the process as "receiving a complete verdict in separate segments." (Ross, supra, 626 F.2d at p. 81.) Due to the "delicacy" of the decision whether to accept a partial verdict, we review it for an abuse of discretion. (United States v. Heriot (6th Cir. 2007) 496 F.3d 601, 608.)
>
> We are sensitive to the danger that a tentative decision by the jury may be converted into a final one by prematurely allowing a separate return of its verdicts as to some counts. Thus, we must carefully scrutinize the circumstances under which the separate return was allowed. The foreperson informed the court that the jury had signed the verdicts on some of the counts, indicating they had made a final rather than a tentative decision as to those counts. Moreover, the court announced that the jurors had reached consensus on many counts and proceeded to poll individual jurors, thus ensuring that the jury intended the partial verdict to be final as to those counts. (United States v. Dakins (D.C. Cir. 1989) 872 F.2d 1061, 1064.)
>
> Here the determinative factor appeared to be the extended recess necessitated by the weekend and a legal holiday. The court may have reasonably believed that by removing six of the counts from further consideration, the jury would have a

better chance of reaching agreement on the remaining counts when it resumed deliberations four days later. Or the court might have been concerned about the risk that one or more of the jurors would have to be replaced given the length of the recess. Whatever the court's subjective motivation actually was, there is simply no evidence in this record that the court abused its discretion since there is no indication the jurors themselves considered their decisions tentative. Nor, we must point out, did [petitioner] object or express any concern or reservation about the entry of the partial verdict.

On appeal, however, [petitioner] contends the process was improper because he did not stipulate to it. He relies on a footnote in a 1982 opinion by this court. (Sylvia v. Superior Court (1982) 128 Cal.App.3d 309, 312, fn. 2 (Sylvia).) Put in context, our old footnote is inapplicable here. Sylvia raised the question whether an acquittal on a felony drunk driving charge prohibited retrial of the lesser included offense of misdemeanor drunk driving when the jury could not agree on the lesser included offense. We affirmed the general rule that "a jury finding of not guilty of the crime charged includes a determination that the defendant is not guilty of any included uncharged offenses." (Id. at p. 312.) We acknowledged, however, an exception to this general rule embodied in People v. Allen (1980) 110 Cal.App.3d 698 (Allen). In Allen, the prosecution and defense invited the court to request partial verdicts as to those counts to which the jurors could agree and to enter mistrials as to the remaining counts. (Sylvia, supra, 128 Cal.App.3d at p. 312.) Thus, the parties stipulated to the process to assert control over retrial of the remaining counts. In response, we added in a footnote the following: "In the absence of a stipulation by the parties as in Allen, it is inappropriate for the court to solicit partial verdicts or to inquire how the jury stands numerically and which way on lesser included offenses. The fact that the trial court does so, alone, constitutes grounds for issuance of a writ of prohibition." (Id. at p. 312, fn. 2.)

Ignoring the factual context in which it was written, [petitioner] would have us convert the footnote into a rule of law precluding partial verdicts in the absence of a stipulation. But the case before us does not involve a lesser included offense or a mistrial, and as a result, there is no issue before us about reprosecution. Our concern in Sylvia was the solicitation of partial verdicts as a way of ending deliberations, rather than as an interim measure while deliberations are ongoing. The footnote has no application where, as here, the partial verdict was merely an interim step to a complete verdict.

[Petitioner] fares no better with a case he cites from the Eighth Circuit Court of Appeals. (United States v. Benedict (8th Cir. 1996) 95 F.3d 17 (Benedict).) In Benedict, the court was particularly troubled by the acceptance of the partial verdict where the prosecution's evidence was virtually the same as to the counts that had been decided and the count yet to be decided. (Id. at p. 20.) Here the evidence was quite different. While the jury may not have decided whether to believe Marina concerning the rape, the eyewitness identifications provided by her husband and sister-in-law supported the partial verdicts. We agree with the Attorney General that the jury's inquiry regarding the definition of a firearm also indicated the jurors were struggling with a legal question involving the assault with a firearm charge. As to both counts, the evidence was not the same as the evidence supporting the remaining counts. Benedict, like Sylvia, has no application to the facts before us.

14

1 People v. Vargas, 2008 WL 565679 at *5-6.

2  Other than stating his claim that the partial verdict was reversible error, petitioner sets forth no arguments, cites no case law and neglects to describe why this was an error. The undersigned also notes that petitioner's trial counsel did not object to the partial verdicts during trial. Based on the Court of Appeal's opinion there was no violation of state law and there is no indication that the state court opinion is contrary to any established Supreme Court authority. In fact, there in no indication of any Supreme Court authority regarding partial verdicts in this context and the Ninth Circuit held in United States v. Ross, 626 F.2d 77 (9th Cir. 1980), that it is permissible for a court to accept partial verdicts and it does not influence the jury. Id. at 81.

 Petitioner has failed to show that the trial court's procedure in any way coerced or influenced the jury. To the extent that petitioner could be arguing this was a due process violation he has made no showing nor can the undersigned find any violations of petitioner's rights. This claim should be denied.

Claim 3 - Sentencing

 Petitioner alleges that the trial court's use of his juvenile record as a basis for imposing an upper term sentence violated his due process rights. Petition. at 24.

Legal Standard

 In Apprendi v. New Jersey, 530 U.S. 466 (2000), the United States Supreme Court held as a matter of constitutional law that, other than the fact of a prior conviction, "any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." 530 U.S. at 490. In Blakely v. Washington, 542 U.S. 296 (2004), the Supreme Court held that the "statutory maximum for Apprendi purposes is the maximum sentence a judge may impose solely on the basis of the facts reflected in the jury verdict or admitted by the defendant." Blakely, 542 U.S. at 303. There is a narrow exception to this rule, however, for enhancements that are based on prior convictions; these need not be submitted to the jury. See Almendarez-Torres v. United States, 523 U.S. 224,

15

244 (1998) ("[T]o hold that the Constitution requires that recidivism be deemed an 'element' of petitioner's offense would mark an abrupt departure from a longstanding tradition of treating recidivism as 'go[ing] to punishment only.'"); Butler v. Curry, 528 F.3d 624, 641 (9th Cir. 2008).

In People v. Black, 35 Cal. 4th 1238 (2005) ("Black I"), the California Supreme Court held that California's statutory scheme providing for the imposition of an upper term sentence did not violate the constitutional principles set forth in Apprendi and Blakely. The court in Black I reasoned that the discretion afforded to a sentencing judge in choosing a lower, middle or upper term rendered the upper term under California law the "statutory maximum." Black I, 35 Cal. 4th at 1257-61.

In Cunningham v. California, 549 U.S. 270 (2007)[4], the United States Supreme Court held that a California judge's imposition of an upper term sentence based on facts found by the judge (other than the fact of a prior conviction) violated the constitutional principles set forth in Apprendi and Blakely. Cunningham expressly disapproved the holding and the reasoning of Black I, finding that the middle term in California's determinate sentencing law was the relevant statutory maximum for purposes of applying Blakely and Apprendi. Cunningham, 549 U.S. at 291-94.[5]

In light of Cunningham, the Supreme Court vacated Black I and remanded the case to the California Supreme Court for further consideration. Black v. California, 549 U.S. 1190 (2007). On remand, the California Supreme Court held that "so long as a defendant is eligible for the upper term by virtue of facts that have been established consistently with Sixth Amendment principles, the federal Constitution permits the trial court to rely upon any number of aggravating circumstances in exercising its discretion to select the appropriate term by

---

[4] The Ninth Circuit subsequently held that Cunningham may be applied retroactively on collateral review. Butler v. Curry, 528 F.3d 624, 639 (9th Cir. 2008).

[5] The effect of Cunningham is much dissipated in that the California legislature, subsequent to Cunningham, provided that the upper term was the statutory maximum. See People v. Sandoval, 41 Cal. 4th 825, 845, 62 Cal. Rptr. 3rd 588, 603 (2007).

balancing aggravating and mitigating circumstances, regardless of whether the facts underlying those circumstances have been found to be true by a jury." People v. Black, 41 Cal. 4th 799, 813 (2007) (Black II).  In other words, as long as one aggravating circumstance has been established in a constitutional manner, a defendant's upper term sentence withstands Sixth Amendment challenge.

Thereafter, relying on Black II, the Ninth Circuit confirmed that, under California law, only one aggravating factor is necessary to authorize an upper term sentence. Butler v. Curry, 528 F.3d 624, 641-43 (9th Cir. 2008).

With respect to use of juvenile adjudications, the Ninth Circuit held in United States v. Tighe that:

> [T]he "prior conviction" exception to Apprendi's general rule must be limited to prior convictions that were themselves obtained through proceedings that included the right to a jury trial and proof beyond a reasonable doubt.  Juvenile adjudications that do not afford the right to a jury trial and a beyond-a-reasonable-doubt burden of proof, therefore, do not fall within Apprendi's "prior conviction" exception.

266 F.3d 1187, 1194 (9th Cir. 2001).

Other federal circuit courts of appeal considering the issue have reached a different conclusion. See, e.g., United States v. Smalley, 294 F.3d 1030, 1032 (8th Cir. 2002). The Ninth Circuit has recognized that the Third, Eighth, and Eleventh Circuits, in addition to California state courts, have held that the Apprendi "prior conviction" exception includes non-jury juvenile adjudications, which can be used to enhance a defendant's sentence. See Boyd v. Newland, 467 F.3d 1139, 1152 (9th Cir. 2006) ( "Tighe ... does not represent clearly established federal law ..."). "[I]n the face of authority that is directly contrary to Tighe, and in the absence of explicit direction from the Supreme Court, we cannot hold that the California courts' use of Petitioner's juvenile adjudication as a sentencing enhancement was contrary to, or involved an unreasonable application of, Supreme Court precedent." Boyd, 467 F.3d at 1152.

\\\\\

Discussion

The Court of Appeal discussed the relevant case law and denied petitioner's claim.

The trial court imposed the upper term firearm use enhancement based on [petitioner's] seven felonies as a juvenile. He complains that the court's sentencing involved impermissible fact finding in violation of his constitutional right to a jury trial. (Cunningham v. California (2007) 549 U.S. ---- [166 L.Ed.2d 856] (Cunningham).) We reject his claim because his prior juvenile adjudications fall within the "prior conviction" exception to Cunningham and its predecessors.

The right to a jury trial does not apply to the fact of a prior conviction. This recently articulated principle of constitutional law has been characterized as the Apprendi/Almendarez-Torres exception to the requirement that a jury find beyond a reasonable doubt any fact exposing the defendant to a greater potential sentence. (Cunningham, supra, 166 L.Ed.2d at p. 869; Blakely v. Washington (2004) 542 U.S. 296 [159 L.Ed.2d 403]; Apprendi v. New Jersey (2000) 530 U.S. 466, 490 [147 L.Ed.2d 435] (Apprendi); Almendarez-Torres v. United States (1998) 523 U.S. 224 [140 L.Ed.2d 350] (Almendarez-Torres).) In People v. Black (2007) 41 Cal.4th 799, the California Supreme Court further held: "[I]mposition of the upper term does not infringe upon the defendant's constitutional right to jury trial so long as one legally sufficient aggravating circumstance has been found to exist by the jury, has been admitted by the defendant, or is justified based upon the defendant's record of prior convictions." (Id. at p. 816.) The only question posed here is whether defendant's juvenile adjudications qualify as prior convictions within the meaning of Apprendi and its progeny. The issue is pending before the Supreme Court in People v. Nguyen (2007) 152 Cal.App.4th 1205, review granted October 10, 2007, S154847.[6]

We conclude that juvenile adjudications fall within the prior conviction exception for Sixth Amendment purposes. Even without a jury trial, a juvenile adjudication has sufficient procedural safeguards-including the rights to notice (Welf. & Inst.Code, § 658), to counsel (Welf. & Inst.Code, § 679), and to confront and cross-examine witnesses (Welf. & Inst.Code, § 702.5), and the privilege against self-incrimination (Welf. & Inst.Code, § 702.5)-to permit a trial court to use it to enhance a sentence without violating the defendant's constitutional rights. (People v. Fowler (1999) 72 Cal.App.4th 581, 585-586; People v. Buchanan (2006) 143 Cal.App.4th 139, 149; People v. Bowden (2002) 102 Cal.App.4th 387, 391-392.) Given these procedural safeguards, one judge has thus concluded, "when a juvenile receives all the process constitutionally due at the juvenile stage, there is no constitutional problem (on which Apprendi focused) in using that adjudication to support a later sentencing enhancement." (United States v. Tighe (9th Cir. 2001) 266 F.3d 1187, 1200 (dis. opn. of Brunetti, J.).)

---

[6] The undersigned notes that the California Supreme Court held that the use of nonjury juvenile adjudications to enhance an adult sentence does not violate Apprendi. People v. Nguyen, 46 Cal. 4th 1007, 1022 (2009).

> We agree. A trial court has the prerogative to enhance a criminal defendant's sentence when a prior adjudication was consistent with constitutional principles. Applying this logic, the trial court properly imposed the upper term without transgressing [petitioner's] right to a jury trial.

People v. Vargas, 2008 WL 565679 at *9-10.

The opinion of the Court of Appeal is not contrary to established Supreme Court authority. Moreover, the undersigned is bound by the Ninth Circuit's ruling in Boyd that the holding in Tighe is not clearly established federal law set forth by the Supreme Court. Boyd, at 1152. Therefore petitioner is not entitled to relief for this claim.

Accordingly, IT IS HEREBY RECOMMENDED that petitioner's application for a writ of habeas corpus be denied.

If petitioner files objections, he shall also address if a certificate of appealability should issue and, if so, as to which issues. A certificate of appealability may issue under 28 U.S.C. § 2253 "only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). The certificate of appealability must "indicate which specific issue or issues satisfy" the requirement. 28 U.S.C. § 2253(c)(3).

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l). Within fourteen days after being served with these findings and recommendations, any party may file written objections with the court and serve a copy on all parties. Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations." Any reply to the objections shall be served and filed within fourteen days after service of the objections. The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order. Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

Dated: 09/07/2010

/s/ Gregory G. Hollows

_____
UNITED STATES MAGISTRATE JUDGE

ggh:ab - varg1697.hc